J-S20033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TRENTEN J. BOBACK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTINA M. PERSHING | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHELE L. BOBACK AND JEFFREY R. | : | |
| BOBACK | : | |
| | : | |
| Appellant | : | No. 231 WDA 2022 |

Appeal from the Order Entered February 10, 2022
In the Court of Common Pleas of Cambria County
Civil Division at No(s):  2014-177

BEFORE:  NICHOLS, J., MURRAY, J., and KING, J.

MEMORANDUM BY KING, J.:                **FILED:  September 14, 2022**

Appellant, Michele L. Boback ("Grandmother") and Jeffrey R. Boback ("Grandfather") (collectively "Grandparents"), appeal from the order entered in the Cambria County Court of Common Pleas, which denied their petition for modification of custody of their minor grandchild, J.M.B ("Child") and changed their custodial time from unsupervised to supervised.  We affirm.

The relevant facts and procedural history of this case are as follows. Appellees, Trenton J. Boback ("Father")[1] and Christina M. Pershing ("Mother")

_____

[1] Grandparents are Father's parents.

are the parents of Child, who was born in 2011. Grandparents played a significant part in caring for Child for the first eight years of her life due to Father's young age, military assignments and Mother's work schedule. On February 5, 2020, the trial court entered a custody order granting shared legal custody to Father and Mother, primary physical custody to Father, and partial physical custody to Mother and Grandparents. Grandparents filed a notice of appeal. This Court affirmed the custody order on September 16, 2020 and our Supreme Court denied the petition for allowance of appeal on December 24, 2020 . *See T.B. v. C.M.W.*, 240 A.3d 934 (Pa.Super. 2020) (unpublished memorandum), *appeal denied*, ___ Pa. ___, 243 A.3d 724 (2020).

On December 9, 2020, Father filed a petition for contempt and special relief alleging that Grandmother was inappropriately disparaging Father and Mother to Child during her custodial time. Grandparents filed a petition for modification of custody and motion for contempt on February 4, 2021. Following a hearing, the court admonished Grandmother from speaking poorly of Father and Mother and discussing matters about the custody trial with Child but denied both Father's and Grandparents' petitions for contempt. The court also determined that Father's request for special relief and Grandparents' petition for modification were better addressed in tandem as they both involved changes to the custody schedule. On October 18, 2021 and October 20, 2021, respectively, Grandparents filed an amended petition for modification of custody and amended petition for special relief, requesting

- 2 -

additional custodial time so Child can spend more time with Carissa Boback ("Paternal Aunt") before she deploys for military duty. The court conducted a summary hearing to address these petitions on November 23, 2021.

Father presented testimony by way of a summary of his position through his counsel, which he affirmed under oath. Father lives in South Carolina with his wife, Justine Boback ("Stepmother"), Child and his two other children. Father and Mother have a great co-parenting relationship. They respectfully and civilly discuss all legal custody issues with one another and cooperate with one another to make custody arrangements. However, Father's relationship with Grandparents is strained because of Grandmother's regular disparaging and disrespectful behavior towards Father and Stepmother. Grandmother lists Father as "Earl" and Stepmother as "Dependa" on her phone, which the court previously determined were derogatory epithets. Grandmother also continues to disparage Father and Stepmother in front of Child even though it upsets Child to the point of crying. Father noted an incident where Grandmother told Child that Father and Stepmother were liars and showed Child text messages between Father, Stepmother and Grandmother. Father also reported that during Christmas, Grandparents sent Child 30 gifts but did not send anything to Father's other children, which made Child uncomfortable and upset for her siblings.

Father reported that other than the continuing issue with Grandparents, Child is happy, healthy and growing in a stable, loving environment. Child is

doing well in school and has a great relationship with Father, Mother, Stepmother, siblings and extended family. Father repaired his relationship with Paternal Aunt and arranged for her to come to his home for Thanksgiving to spend time with Child and her siblings. Father stated that Paternal Aunt did not ask or know that Grandparents filed a petition for modification on the basis that she needed to spend more time with Child.

Grandparents presented testimony by way of a summary through their counsel as follows. Grandparents were Child's primary caregivers for the first eight years of her life and want additional time to maintain a strong relationship with her. Grandparents go the "extra mile" to spend time with Child, including traveling to South Carolina, booking hotels, and planning fun activities for her. Grandparents have a loving relationship with Child and Child expresses a desire to spend more time with them after most of her visits. Father does not provide Grandparents updates on Child's life and is slow to communicate in setting up visitation. Grandparents denied talking negatively about Father and Mother or discussing custody matters in front of Child. Grandparents also raised concerns about Child struggling in school and scratches on Child's face while Child was in Father's custody.

Grandmother affirmed the testimony by summary under oath and provided additional direct testimony as follows. Grandmother denied that she was talking about Father or the court case to Child when Child started crying during her summer visit with Grandparents. Grandmother stated that she

asked Child if she could throw out some old clothes and toys that Child had outgrown and Child became upset. After Child got upset, Grandmother refrained from discussing it further. Grandfather also affirmed the testimony by summary under oath and provided additional direct testimony that supported Grandmother's account of events.

Mother testified that she has not seen any scratches on Child's face. Additionally, Mother said Child is doing well in school and recently got tested for gifted classes. Further, after Child came back from visiting Grandparents during the summer, Child told Mother that Grandfather had to stop Grandmother from talking about things that upset her.

The court interviewed Child, who was ten years old at the time of the hearing, in the presence of counsel. Mother, who represented herself, waived her right to be present. Child testified that she is doing great in school except for one or two bad grades and recently tested for gifted classes. Child stated that she is happy living with Father, Stepmother and her siblings. Child testified that she loves her brothers and they play games together. She also has her own room, has pets that she loves, and close friends in the neighborhood and at school. Child testified that she would not change the current custody schedule and that the amount of time she spends with Grandparents is "actually perfect."

Child recounted an incident when she was visiting Grandparents, where Grandfather was not at the house and Grandmother began talking to her about

custody matters. Child started crying and asked Grandmother to stop but Grandmother did not stop until Grandfather returned home and told her to stop. Child stated that she got upset because Grandmother was saying that Father and Stepmother were liars and are "the bad guys." Grandmother also told Child that that she would sell all of Child's toys because Father and Stepmother would never let Grandparents see Child again if Child stayed with Father. Additionally, Child stated that Grandmother repeatedly asks Child if she wants to live with Grandparents again and badgers her until she says yes. Child recounted another incident where Grandmother showed her text messages between Grandmother, Father and Stepmother. Grandmother told Child that Father and Stepmother were lying in the texts stating that Child did not want to speak with Grandparents on the phone. Child testified that the texts were accurate and that she did not want to speak to Grandparents because she was still upset about Grandmother's disparaging comments about Father and Stepmother.

Child testified that Father and Stepmother do not say anything bad about Grandparents to her and encourage her to speak to Grandparents. Child stated that she thinks Mother and Stepmother are best friends and believes that Father and Mother are friends as well. Additionally, Father does not say bad things about Mother to Child and encourages her to love everyone.

After considering all the evidence, the court entered a custody order on February 10, 2022, which largely maintained Child's previous custody

schedule. However, the court restricted Grandparents' custodial time to supervised physical custody during the summer and holidays, at Father and Mother's reasonable discretion. On February 22, 2022, Grandparents filed a timely notice of appeal and a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Grandparents raise the following issues for our review:

Does the trial court abuse its discretion by awarding primary custody to [Father]?

Does the trial court fail to consider the best interests of the minor child when awarding [Father] primary custody?

Does the trial court commit an error by requiring that [Grandparents'] custodial time with the minor child be supervised?

(Grandparents' Brief at 6).

In their issues combined, Grandparents assert that they were Child's primary caregivers and performed all parental duties for Child until 2020 when Father was awarded primary physical custody. Grandparents contend that the court failed to consider Father's actions in limiting Grandparents' custodial time and placed too much emphasis on one incident where Child became upset in Grandparents' care. Further, Grandparents argue that they are better equipped to provide Child with stability because Father is in the military and could be deployed for service while Grandmother is not working and can provide full-time care for Child. Grandparents claim they provided a loving, supportive home for Child and attended to all her needs for most of her life.

Grandparents insist Child has a strong bond with them and reducing Grandparents' time with Child to short periods of supervised physical custody subject to Father and Mother's discretion would be severely detrimental to Child's relationship with Grandparents. Grandparents conclude the court failed to adequately consider Child's best interests in entering the instant custody order, and this Court should vacate the custody order. We disagree.

In reviewing a child custody order:

> [O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.J.S. v. M.J.S.*, 76 A.3d 541, 547-48 (Pa.Super. 2013) (internal citation omitted). "With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child." *M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa.Super. 2013), *appeal denied*, 620 Pa. 710, 68 A.3d 909 (2013) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa.Super. 2011)).

The Child Custody Act provides:

### § 5328.  Factors to consider when awarding custody

**(a)**      **Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1)    Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2)    The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3)    The parental duties performed by each party on behalf of the child.

(4)    The need for stability and continuity in the child's education, family life and community life.

(5)    The availability of extended family.

(6)    The child's sibling relationships.

(7)    The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)    The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

After a thorough review of the certified record, the parties' briefs, and the relevant law, we conclude the trial court's decision is supported by competent evidence. *See S.J.S., supra*. Consequently, we affirm the custody order based on the rationale provided in the trial court's opinion.

The court considered all the evidence as it pertained to the custody

factors and determined that factors one, four, six, seven, eight, nine, ten, and thirteen weighed against Grandparents and no new credible evidence was presented on the remaining factors as to weigh them in favor of any party. (*See* Trial Court Opinion, filed 2/10/22, at 12-22). Specifically, the court found that Grandmother consistently disparages Father and Stepmother and discusses custody matters in front of Child. (*Id.* at 18-19). In doing so, Grandmother disregarded the court's prior admonitions, Child's pleas to stop, and Child's emotional welfare. (*Id.*) Further, the court decided Father has shown a willingness to mend relationships and cooperate with others in Child's life, as demonstrated by his strong co-parenting relationship with Mother and repaired relationship with his sister. (*Id.* at 12-13). Additionally, Father is more likely to foster a continued relationship between Child and other parties based on Child's testimony that Father encourages her to speak to Grandparents and to love everyone. (*Id.*)

The court further determined that Child is in a stable, loving environment where she is happy and doing well in all aspects of her life. (*Id.* at 14-15). Child clearly and explicitly stated her preference to remain in Father's primary custody and indicated that the current custody schedule was to her liking. (*Id.* at 17-18). Child also expressed her distress at Grandmother's negative comments about Father and Stepmother and pressure to discuss custody preferences, and Child indicated that she does not know how to make Grandmother stop. (*Id.*). Accordingly, the court found it

was in Child's best interests to remain in Father's primary physical custody and restrict Grandparents' time with Child to supervised physical custody. *See M.J.M., supra*. As to the foregoing points, we adopt the court's reasoning as our own. Accordingly, we affirm on the basis of the trial court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/14/2022

Filed 3/10/2022 4:47:27 PM Superior Court Western District
231 WDA 2022

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CIVIL DIVISION

| | | |
|---|---|---|
| TRENTEN J. BOBACK, | : | No. 2014 – 177 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHRISTINA M. WENDELL, now | : | |
| CHRISTINA M. PERSHING, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHELE L. BOBACK and | : | |
| JEFFREY R. BOBACK, | : | |
| | : | |
| Intervenors. | : | |

*************

APPEARANCES:

| | |
|---|---|
| For Plaintiff: | RANDI J. SILVERMAN, ESQUIRE |
| For Defendant: | SELF-REPRESENTED |
| For Intervenors: | LAUREN DARBOUZE, ESQUIRE |
| | ANDREW SHESKO, ESQUIRE |

*************

## OPINION

FLEMING, J., February 9, 2022. This case comes before the Court on four pleadings, namely: (1) Plaintiff's Petition for Contempt and Special Relief[1] filed December 9, 2020; (2) Intervenors' Amended Petition for Modification of Custody filed October 18, 2021; (3) Intervenors' Petition for Special Relief filed October 18, 2021; and (4) Intervenors' Amended Petition for Special Relief filed October 20, 2021.

---

[1] This Court addressed the special relief component only. *See* PROCEDURAL HISTORY, below.

## PROCEDURAL HISTORY

Plaintiff, Trenten J. Boback ["Father"], and Defendant, Christina M. Wendell, now Christina M. Pershing ["Mother"], are the parents of one minor child, namely, J.M.B. (a 10-year-old female born in 2011) ["Child"]. Intervenors, Michele L. Boback and Jeffrey R. Boback [individually and respectively "Paternal Grandmother" and "Paternal Grandfather," and collectively "Paternal Grandparents"], are Child's paternal grandparents. Father and Mother share legal custody of Child; Father exercises primary physical custody; Mother has partial physical custody; and Paternal Grandparents have partial physical custody.

This Court filed the operative custody order on February 5, 2020. *See* ORDER DATED FEB. 4, 2020, FILED FEB. 5, 2020; *see also* OPINION AND ORDER DATED JAN. 15, 2020, FILED JAN. 16, 2020. Paternal Grandparents appealed to the Superior Court. *See* NOTICE OF APPEAL FILED MAR. 4, 2020. The Superior Court affirmed this Court's Order, and the Pennsylvania Supreme Court denied Paternal Grandparents' Petition for Allowance of Appeal. *See T.B. v. C.M.W., now C.M.P. v. M.L.B. and J.R.B*, 2020 WL 5548322 (Pa. Super. Sept. 16, 2020), *allowance of appeal denied*, 2020 WL 7654296 (Pa. Dec. 24, 2020).

Father filed the instant Petition for Contempt and Special Relief on December 9, 2020. On February 4, 2021, Paternal Grandparents filed a Petition for Modification of Custody ["Petition for Modification"] and a Motion for Contempt.[2] [Collectively, this Court refers to the two contempt petitions as "Cross-Contempt Petitions."] The Court conducted hearings on the Cross-Contempt Petitions on April 13, 2021; April 26, 2021; and July 13, 2021, via Zoom video conferencing pursuant to Cambria County's Administrative Order dated June 30, 2020, which recommended the use of Advanced Communication Technology during the coronavirus pandemic. Ultimately, the Court denied Paternal Grandparents' Motion for Contempt. *See* OPINION AND ORDER DATED AUG. 30, 2021, FILED AUG. 31, 2021. The Court found Paternal Grandmother's actions to be "shocking" but not punishable by contempt; the Court also determined that Father's request for special relief was most appropriately resolved in conjunction with custody modification proceedings. *Id.* Thus, this Court denied Father's Petition for Contempt and Special Relief in part

---

[2] Father filed preliminary objections to the Petition for Modification, which were eventually denied. This Court refrained from cataloging the filings and proceedings related to the preliminary objections in a largely unfruitful attempt at brevity.

2

and referred the special relief portion of the Petition to a Hearing Officer for consolidation with ongoing custody modification proceedings. *Id.*

On October 18, 2021, Paternal Grandparents filed the instant Petition for Special Relief and Amended Petition for Modification of Custody ["Amended Petition for Modification"]. On October 20, 2021, Paternal Grandparents filed the Amended Petition for Special Relief considered herein. On October 22, 2021, Hearing Officer Christopher G. Gvozdich filed a Report and Recommendation confirming that Father and Paternal Grandparents requested a *de novo* hearing before the undersigned judge.

This Court conducted a half-day summary hearing[3] on November 23, 2021, to address Paternal Grandparents' Amended Petition for Modification, as well as all outstanding petitions for special relief filed by any party. *See* ORDER DATED OCT. 25, 2021, FILED OCT. 26, 2021.

## FINDINGS OF FACT

Father presented testimony by summary through his counsel, which he affirmed under oath. Paternal Grandparents each presented evidence through a combination of counsel's verified summary and direct testimony.[4] Mother testified directly, as she is self-represented. Additionally, this Court interviewed Child in camera. Child answered questions from this Court, Father's counsel, and Paternal Grandparents' attorney; Mother waived her right to be present.

A preponderance of the evidence establishes the following facts, as well as those facts set forth in the court's review of the custody factors below:

1.     Father and Mother have a strong co-parenting relationship; they discuss all relevant issues regarding Child's upbringing. N.T. (NOV. 23, 2021), at pp. 10-11. Additionally, Father and Mother demonstrate admirable cooperation and civility. By way of example, Father and Mother agreed to alter their typical holiday arrangements in 2021. Ultimately, Child would remain with Father for Thanksgiving to accommodate family visits and, in turn,

---

[3] This Court scheduled a summary hearing because of the number of petitions under consideration and the limited time (one-half day) for presentation.

[4] To avoid unnecessary repetition, this Court will not parallel cite the summary testimony affirmations with the substantive summary testimony but, instead, notes the location of the affirmations here. The parties' respective affirmations appear in the transcript as follows: N.T. (NOV. 23, 2021), at pp. 19-20 (Father); 34 (Paternal Grandmother); and 35-36 (Paternal Grandfather).

3

Child would spend approximately two full weeks with Mother during the Christmas break. N.T. (Nov. 23, 2021), at pp. 14-15, 56; *see also* AMENDED PETITION FOR SPECIAL RELIEF, FILED OCT. 20, 2021, at ¶ 10.

2. Father has demonstrated a willingness and ability to mend damaged relationships. By way of example, Father repaired his relationship with his sister, Carissa Boback ["Paternal Aunt"], and invited her to his home around Thanksgiving 2021. N.T. (Nov. 23, 2021), at pp. 14-15, 56. Paternal Aunt had testified against Father or otherwise testified adversely to his interests in a prior proceeding. *See generally* OPINION DATED JAN. 15, 2020, FILED JAN. 16, 2020, ["2020 CUSTODY OPINION"].

3. Child describes Father's wife, Justine ["Stepmother"], and Mother as "best friends;" Child loves the cordial relationship Stepmother and Mother share. N.T. (Nov. 23, 2021), at p. 64.

4. Child is generally not privy to the conversations between Father and Mother but believes they are friends, too. N.T. (Nov. 23, 2021), at pp. 64-65.

5. Father and Mother share a respectful relationship; their relationship is akin to that of friends. N.T. (Nov. 23, 2021), at p. 11.

6. Child has three half-siblings. N.T. (Nov. 23, 2021), at p. 54. Two younger half-brothers live in Father's household; one younger half-sister lives in Mother's household.

7. Child testified with a degree of intelligence and maturity that exceeds what would be expected of a child her chronological age (10 years old). Child appeared to be happy – happy living in Father's household and happily looking forward to spending time with Mother near Christmas 2021. N.T. (Nov. 23, 2021), at pp. 54, 65, 70.

8. Prior to the Hearing, Father informed Child she would be interviewed by the Court. Father told Child to answer questions truthfully. Father did not discuss custody issues with Child, tell Child what to say, or influence Child in any way regarding custody or other court matters. N.T. (Nov. 23, 2021), at pp. 52-53, 65, 67-68.

9. Child enjoys living with Father, and she likes his house in South Carolina. N.T. (Nov. 23, 2021), at pp. 54, 65.

4

10. Child has friends who live on the same street in South Carolina. N.T. (Nov. 23, 2021), at p. 65.

11. Child enjoys the school she attends in South Carolina. N.T. (Nov. 23, 2021), at p. 65.

12. Child does well in school with very few exceptions. N.T. (Nov. 23, 2021), at pp. 53, 68. Child has been tested for a gifted learning program and was awaiting results at the time of the hearing. *Id.* at p. 53.

13. Child refers to Paternal Grandparents as "Pap" and "Mimi." N.T. (Nov. 23, 2021), at pp. 56-57.

14. Child refers to Stepmother's parents ["Step-Grandparents"] as "Pappy" and "Grammy." N.T. (Nov. 23, 2021), at p. 57.

15. Paternal Grandparents told Child that Step-Grandparents are not her family. N.T. (Nov. 23, 2021), at pp. 7, 44.

16. Paternal Grandmother discusses custody issues with Child. N.T. (Nov. 23, 2021), at pp. 6-7, 57-61, 63.

17. Paternal Grandmother disparages Father, Stepmother, and – to a lesser extent – Mother in front of Child. N.T. (Nov. 23, 2021), at pp. 6-7, 59, 64.

18. Paternal Grandmother tells Child that Father and Stepmother "lie" and that they are "the bad guys." N.T. (Nov. 23, 2021), at pp. 59, 64.

19. For Christmas 2020, Paternal Grandparents sent Child over 30 gifts but sent nothing to their other grandchildren (Child's two half-brothers). N.T. (Nov. 23, 2021), at p. 13.

20. During a period of summer custody, Paternal Grandmother told Child that Paternal Grandparents were going to "sell" or "get rid of" Child's clothes and toys at their house because Child would "never see" Paternal Grandparents if she lived with Father and Step-Mother. N.T. (Nov. 23, 2021), at p. 66.

21. Paternal Grandmother repeatedly asks Child if she wants to live with Paternal Grandparents. N.T. (Nov. 23, 2021), at pp. 59-60, 66. Sometimes Child answers "no" and

5

sometimes Child ignores the question, but Paternal Grandmother "bugs" Child until she says she wants to live with Paternal Grandparents. *Id.* at pp. 59-60.

22. Child testified credibly that she has made her desires clear to Paternal Grandmother, namely, that Child wants to live with Father and Stepmother. N.T. (Nov. 23, 2021), at pp. 57, 60.

23. Paternal Grandmother knows that Child wants to continue living with Father and Stepmother in South Carolina. N.T. (Nov. 23, 2021), at pp. 59-60.

24. Paternal Grandmother upsets Child by discussing custody issues with her; by disparaging Father, Stepmother, and Mother; and by treating Child's half-brothers less favorably than Child. N.T. (Nov. 23, 2021), at pp. 13, 57-66. Paternal Grandmother knows that she upsets Child by these behaviors. *Id.* at pp. 60-61. Paternal Grandmother regularly disregards Child's feelings and continues to engage in the offensive behaviors. *Id.* at pp. 13, 57-66.

25. Paternal Grandmother fails to respect Child's wishes and does not care that her actions are harmful to Child. N.T. (Nov. 23, 2021), at pp. 57-58, 60-61.

26. Paternal Grandmother does not appreciate that her actions are harmful to the quality of life Father and Mother can foster in their respective households. N.T. (Nov. 23, 2021), at p. 13.

27. On at least one occasion, Paternal Grandmother's discussion of custody issues and/or disparagement of Father and Stepmother caused Child to become so upset that she cried. N.T. (Nov. 23, 2021), at pp. 58, 60-61, 66.

28. On at least one occasion, when Paternal Grandmother began discussing custody issues or disparaging parents or Stepmother in front of Child, Child explicitly told Paternal Grandmother to stop. N.T. (Nov. 23, 2021), at pp. 57-58. Paternal Grandmother refused to stop until Paternal Grandfather intervened. *Id.* at pp. 58, 65-66. This is the only established instance in which Paternal Grandfather intervened to stop Paternal Grandmother from upsetting Child. *Id.* at p. 12.

29. Paternal Grandparents both testified that *neither* of them discusses custody issues with Child. N.T. (Nov. 23, 2021), at pp. 31-32, 36-37. Both also testified that Paternal

6

Grandfather was never required to intervene to stop Paternal Grandmother from discussing custody issues with Child that upset her. *Id.* Paternal Grandparents' testimony in this regard lacked credibility.

30. Paternal Grandfather largely enables Paternal Grandmother's outrageous behavior by generally remaining passive when Paternal Grandmother upsets Child.

31. Paternal Grandfather generally does not discuss custody issues with Child. N.T. (Nov. 23, 2021), at pp. 57-58.

32. The testimony of Paternal Grandparents substantially lacked candor and credibility on nearly all material issues. Some of their claims are baseless fabrications, including an allegation (by summary) that Child may not be safe in Father's care because of scratches on her face. N.T. (Nov. 23, 2021), at p. 21. Mother spoke to and saw Child (presumably by video) a few days prior to the hearing. *Id.* at p. 48. Mother did not observe any scratches on Child's face. *Id.* Mother's testimony was pointed and credible. This Court also observed Child during the in-camera interview by video conference. Child did not have any scratches, scars, bruises, or other suspicious marks on her face, nor did she testify to any injuries.

33. Portions of Paternal Grandparents' testimony obdurately attempted to relitigate historical facts that were determined in the 2020 Custody Opinion, which was appealed and affirmed. By way of example, Paternal Grandmother testified that Paternal Grandparents permitted Father "liberal visitation" with Child when Paternal Grandparents had primary physical custody of Child. N.T. (Nov. 23, 2021), at p. 33. By way of further example, Paternal Grandfather testified, "As far as [Father] not getting visitation, he never wanted it. We offered many, many times[.]" *Id.* at p. 41. However, this Court previously determined that "Paternal Grandparents significantly thwarted Father's efforts to maintain communication and to have meaningful custody of Child after Father joined the active duty military." 2020 CUSTODY OPINION, at ¶ 36.

34. Paternal Grandmother obdurately attempted to "feed" Paternal Grandfather information during his testimony. N.T. (Nov. 23, 2021), at p. 39.

7

35. Paternal Grandmother continues to list Father as "Earl" in her phone, without remorse. INTERVENORS' EX. 1; N.T. (NOV. 23, 2021), at pp. 9-10. This Court previously determined that "Earl" is a derogatory epithet. OPINION DATED AUG. 30, FILED AUG. 31 ["CROSS CONTEMPT OPINION"], at ¶ 19.

36. Paternal Grandmother refers to Stepmother as "Dependa." N.T. (NOV. 23, 2021), at p. 10. This Court previously determined that "Dependa" is a derogatory epithet. CROSS CONTEMPT OPINION, at ¶ 19.

37. Paternal Grandmother refers to Father as a "sperm donor." N.T. (NOV. 23, 2021), at p. 10.

38. Despite Paternal Grandmother's outrageous behavior, Father and Stepmother encourage Child to speak with Paternal Grandparents. N.T. (NOV. 23, 2021), at p. 61.

39. When Paternal Grandmother is not discussing custody issues with Child or disparaging Child's parents or Stepmother, Child enjoys her time with Paternal Grandparents. N.T. (NOV. 23, 2021), at p. 69. They engage in activities such as visiting water parks, and Child describes the time as "like a vacation." *Id.* However, Child does not know how to stop Paternal Grandmother from upsetting her because Paternal Grandmother has "done it for so long." *Id.* at p. 66.

40. Child "kind of forgave" Paternal Grandmother for her actions but needs more time to forgive her completely. N.T. (NOV. 23, 2021), at p. 70.

41. At times, Child does not want to speak to Paternal Grandparents because of Paternal Grandmother's behavior. N.T. (Nov. 23, 2021), at pp. 63-64, 69. An incident near Thanksgiving 2020 particularly upset Child. *Id.* at pp. 63-64.

42. Child did not want to see Paternal Grandparents for Christmas 2021. N.T. (NOV. 23, 2021), at p. 70. Child was looking forward to spending time with Mother, Stepfather, and her half-sister. *Id.*

43. Child testified sincerely and credibly on all issues, with one caveat. Child may have conflated some aspects of different incidents involving Paternal Grandmother (*e.g.,* whether Child cried during a summer incident, a Thanksgiving incident, or both). This Court finds the potential conflation of these minute details to be understandable; and it does

8

not impair her overall credibility in light of her age, the number of incidents, and the time between incidents.

44. At the conclusion of the summary hearing, all of the parties confirmed that they had no additional evidence to present; and they agreed that a full evidentiary hearing was not necessary. N.T. (Nov. 23, 2021), at pp. 72-73.

## LEGAL ANALYSIS

This Court begins its discussion with Paternal Grandparents' Petition for Special Relief and Amended Petition for Special Relief, filed two days apart. *See generally* PETITION FOR SPECIAL RELIEF, FILED OCT. 18, 2021, ["OCTOBER 18, 2021, PETITION"]; AMENDED PETITION FOR SPECIAL RELIEF, FILED OCT. 20, 2021, ["OCTOBER 20, 2021, PETITION"].

At the November 23, 2021, hearing, Paternal Grandparents' attorney asked to withdraw the October 18, 2021, Petition. This Petition alleged that *Mother* would be deployed by the military in November 2021 and would be unable to exercise her periods of custody. *See* OCT. 18, 2021, PETITION, at ¶ 8. Paternal Grandparents sought to acquire all of Mother's custodial time. *Id.* at ¶ 9. The allegations in the October 18, 2021, Petition are, and always have been, patently false. Mother is not even enlisted in the military.

In the October 20, 2021, Petition, Paternal Grandparents allege that *Paternal Aunt* (their daughter, who is not a party to this case) would soon be transferred by the military to North Carolina to await imminent deployment. *See* OCT. 20, 2021, PETITION, at ¶ 8. Paternal Grandparents sought additional custodial time "to allow for the minor child and her aunt to spend meaningful time together prior to her deployment." *Id.* at ¶ 9.

The October 20, 2021, Petition is an abuse of the special relief process for several reasons. First, special relief is primarily for emergency or otherwise important relief. *See S.W.D. v. S.A.R.*, 96 A.3d 396, 405 (Pa. Super. 2014); *Steele v. Steele*, 545 A.2d 376, 378 (Pa. Super. 1988). This is neither. Second, there is no evidence, or even allegations, to suggest that Child and Paternal Aunt have a special relationship to support the appropriateness of the requested relief. In contrast, this Court previously noted that Paternal Aunt has had limited contact with Child and the family. *See* 2020 CUSTODY OPINION, at ¶ 41. Third, despite learning that Paternal Aunt was not being

9

"imminently deployed" (the entire rationale for the requested relief), Paternal Grandparents did not withdraw the Amended Petition for Special Relief. N.T. (Nov. 23, 2021), pp. at 3-4.

Fourth, the custody order affords Mother and Father the ultimate authority to mutually decide Child's holiday schedule. Paternal Grandparents knew that Thanksgiving 2021 would have been Mother's year for the holiday but for her agreement to allow Child to stay with Father because Child's Step-Grandparents would be visiting. OCT. 20, 2021, PETITION, at ¶ 10. Paternal Grandparents' requested relief not only grossly disrespects Father's arrangements, but Mother's as well.

Fifth, Paternal Grandparents attempted to use Paternal Aunt as a proxy to acquire additional custody time for themselves. During Father's custodial time, it is *his* prerogative to determine whether or to what extent Child will spend time with her extended family. Furthermore, when Paternal Grandparents filed the October 20, 2021, Petition, Father had already arranged a holiday plan with Paternal Aunt; and Paternal Grandparents knew this. OCT. 20, 2021, PETITION, at ¶ 11. Paternal Aunt never asked Paternal Grandparents to file the October 20, 2021, Petition; and she was angry with them for doing so. N.T. (Nov. 23, 2021), at pp. 15, 38. Paternal Grandfather admitted that Paternal Aunt was merely a pawn to acquire additional custody time for Paternal Grandparents. Paternal Grandfather testified, "Yeah, [Paternal Aunt] didn't want us to say that and ask for time[,] but we needed to get something[.]" N.T. (Nov. 23, 2021), at p. 38. By using Paternal Aunt as a proxy in an attempt to acquire additional custody time for themselves, Paternal Grandparents willfully caused potential harm to Father's relationship with Paternal Aunt, which he had recently repaired.

At this point, the October 18, 2021, Petition is withdrawn, and the October 20, 2021, Petition is moot. However, this Court stresses, in the strongest terms possible, that – but for those outcomes – the Petitions would have been denied. The former was frivolous, as it was filled with false and mistaken information. The latter was an abuse of the special relief process, as well as a disingenuous ploy; and Paternal Grandparents did not withdraw the action when they learned that the basis for the requested relief was no longer applicable. Paternal Grandparents' conduct and intent in filing and litigating (or otherwise belatedly withdrawing) the October 18 and October 20, 2021, Petitions was obdurate, vexatious, and in the utmost bad faith. Accordingly, this Court will

10

award Father reasonable counsel fees for the preparation and litigation of said petitions.[6] *See* 23 PA. CONS. STAT. ANN. § 5339. Mother is self-represented; otherwise, she would also be awarded reasonable counsel fees.

Next, this Court briefly discusses Father's request for special relief, namely, a suspension of Paternal Grandparents' partial physical custody, as well as limiting Paternal Grandparents to virtual contact monitored by Child's counselor until the counselor recommends reinstatement. *See* PETITION FOR CONTEMPT AND SPECIAL RELIEF, FILED DEC. 9, 2020. Ordinarily, only temporary relief can be granted for a special relief petition. However, as noted in the procedural history above, this Court consolidated the special relief action with the ongoing modification proceedings. Thus, indefinite relief is permissible at this juncture because the modification proceedings have concluded.

In a custody determination, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child. *See* 23 PA. CONS. STAT. ANN. § 5328(a)(1-16). As a preface to the analysis below, this Court notes that Paternal Grandparents' testimony substantially lacked candor and credibility on nearly all material issues. To the extent their evidence impacted the custody factors at all, it was only by virtue of the sheer lack of candor and credibility in their testimony. In other words, Paternal Grandparents failed to produce any evidence that would improve their position under any of the custody factors. However, credible testimony presented by Father, Mother, and Child significantly influenced the analysis and made it clear that it is in Child's best interests to have only supervised contact with Paternal Grandparents at this time, unless or until Paternal Grandparents show a marked change in their behavior, conduct, and interactions. To that extent,

---

[6] On a similar note, the Amended Petition for Modification was never withdrawn or corrected. Like the October 18, 2021, Petition, it alleged that Mother was being deployed by the military and requested all of her custodial time in addition to primary physical and shared legal custody. *See* AMENDED PETITION FOR MODIFICATION, at ¶ 18; WHEREFORE CLAUSE. Mother is not in the military. Paternal Grandparents, through their counsel, acknowledged the false allegations in the October 18, 2021, Petition but proceeded to litigate the Amended Petition for Modification anyway. *See* N.T. (NOV. 23, 2021), at p. 3. This is consistent with Paternal Grandparents' refusal to take responsibility for their actions and admit wrongdoing. Paternal Grandparents could have asked to proceed on the original Petition for Modification but chose to remain obstinate and obdurate.

11

even if Father could not exercise primary physical custody for some reason, Mother would be the appropriate party to receive primary physical custody – NOT Paternal Grandparents.

In the case at bar, this Court considered the enumerated factors as follows:

**1.** ***Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.***

Father and Mother are both the most likely to encourage and permit frequent and continuing contact between Child and another party – by a wide margin. As noted above, Mother and Father cooperated to modify Child's Thanksgiving and Christmas 2021 holiday schedule to accommodate their respective family issues. Similarly, Father repaired his relationship with Paternal Aunt and facilitated contact with Child despite Paternal Aunt's prior testimony against Father. Although Paternal Aunt is not a party to this case, Father's willingness to mend fences is noteworthy. Heartwarmingly, Child believes that Stepmother and Mother are best friends, and that Father and Mother are friends, too. This is how a child should view the relationship between her parents, and it is a powerful testament to the civility and cooperation between Mother and Father.

In contrast, nothing has changed this Court's prior analysis regarding Paternal Grandparents' failure and refusal to foster relationships with Child's parents, namely, "Paternal Grandparents had ample opportunities to foster a loving relationship between Child and her active duty military father (their son), but they failed or refused to do so." 2020 CUSTODY OPINION, at p. 25. Paternal Grandparents continue to refer to Father as "Earl" in their exhibits, which this Court previously determined is a derogatory term. *See* INTERVENORS' EX. 1; N.T. (NOV. 23, 2021), at pp. 9-10; OPINION DATED AUG. 30, FILED AUG. 31 ["CROSS CONTEMPT OPINION"], at ¶ 19. Paternal Grandmother was unapologetic, but the derogatory name is illustrative of her scorn, disparagement, and disrespect for Father. By way of examples, Paternal Grandmother told Child that Father is responsible for keeping Child from seeing them and that Father is a liar. Paternal Grandmother's denials of these allegations lack credibility and further demonstrate a refusal to accept personal responsibly for her outrageous actions. Paternal Grandmother's conduct does not reflect a person who is willing and able to foster and encourage frequent and continuing contact between Child and Father.

12

Importantly, Paternal Grandfather previously testified that Paternal Grandparents only wanted to maintain primary physical custody of Child until the relationship between Child and her parents "blossomed" – which, in Paternal Grandfather's mind, would occur around the time Child turned 10 or 11 years old. *See* 2020 CUSTODY OPINION, at pp. 23-24. Child was nine years old when Paternal Grandparents filed the original Petition for Modification of Custody. Child was just shy of 10 years old when Paternal Grandparents filed their Amended Petition for Modification of Custody. Child was 10 years old by the November 23, 2021, hearing. Child's relationships with Father and Mother *have* blossomed; Child enjoys the current custody order and does not seek additional time with Paternal Grandparents. This Court previously found Paternal Grandfather's *stated desire* to be both unrealistic and counterintuitive. *See* 2020 CUSTODY OPINION, at p. 24. Now, it is clear that Paternal Grandfather's *alleged desire* was false, too. Through their clear lack of candor and credibility, Paternal Grandparents demonstrated they will say and do anything if they think it will help them get what they want in that moment.

This factor is highly significant, weighs substantially against Paternal Grandparents, and weighs favorably for both Father and Mother.

**2.** **_The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party, and which party can better provide adequate physical safeguards and supervision of the child._**

No party offered any new evidence regarding this factor. As such, this Court's analysis remains substantively unchanged, with the caveat that the events supporting the prior analysis were deemed to be remote then, and are even more remote now. *See generally* 2020 CUSTODY OPINION, at pp. 25-27. To the extent this factor previously weighed slightly against Father, it receives even less weight now than it did nearly two years ago.

**2.1.** **_The information set forth in Section 5329.1(a) (relating to consideration of child abuse and involvement with protective services)._**

No party offered any credible evidence regarding child abuse and/or involvement with child protective services. In summary testimony, Paternal Grandparents' counsel alleged that Child "is being scratched in her face" and suggested that Child may not be safe in Father's care. Like the bulk of Paternal Grandparents' testimony, this allegation lacked credibility, to the extent

13

of being a pure fabrication. When this Court interviewed Child *in camera* via video-conference, Child had no scratches, scars, or any other suspicious marks on her face. She did not testify regarding any injuries received in Father's care. Mother also credibly testified that she saw Child (presumably via video communication) without visible injuries when speaking to her a few days before the hearing. This sub-factor is not relevant.

## 3. *The parental duties performed by each party on behalf of the child.*

Generally, the parties presented minimal new evidence regarding this factor, but the Court can make several reasonable inferences. In the 2020 Custody Opinion, this factor heavily favored Paternal Grandparents because Father and Mother delegated many parental responsibilities to Paternal Grandparents when Child was an infant; when Child was born, Father and Mother were relatively young as well. *See* 2020 CUSTODY ORDER, at pp. 28-29. However, nearly two years have passed since that order was issued.

Since then, Father has exercised primary physical custody; Mother has exercised partial physical custody, primarily during the summer and on holidays; and Paternal Grandparents have had limited periods of partial physical custody during Child's summer vacation and near the holidays. Mother and Father have shared legal custody; Paternal Grandparents do not have legal custody. While no one can diminish Paternal Grandparents' actions to help raise Child from her birth through July 2019, for the past 2½ years, Child has primarily lived with Father. Child's successes and failures during this time are naturally a reflection of the environment Father fosters in his household. Similarly, for nearly two years, Mother and Father have overseen all legal custody matters pertaining to Child (*e.g.*, medical appointments and care, nutrition, education, etc.). There was no evidence that Child is ill, malnourished, having difficulty in school, or ailing in any other manner.

This Court interviewed Child via Zoom videoconference technology. Child was in her bedroom, which appeared to be clean and orderly. Similarly, Child's appearance reflected good hygiene. Graciously, Child afforded this Court the pleasantry of viewing her pet bearded dragon, "Medusa." Child indicated that she does very well in school despite a bad test or two in social studies. Additionally, Child recently tested to enter a program for gifted students but had not yet received the results. Paternal Grandparents alleged that Child was doing poorly in school, which

14

Mother refuted. Mother's testimony in this regard was noteworthy, as she spoke pointedly and with conviction. By all accounts, Child appears to be doing very well academically. This Court can infer that Child's academic success is fostered, not hindered, by living in Father's household. By the tidy appearance of Child's room, this Court can also infer that Father's household fosters an admirable level of structure and organization. It is also apparent that Mother endeavors to remain apprised of Child's academic performance.

At least between Father and Paternal Grandparents, this factor is largely neutral at this juncture.

4.   *The need for stability and continuity in the child's education, family life, and community life.*

Child has lived with Father for 2½ years. She is happy, perceivably healthy, developing typical sibling relationships with her half-siblings (discussed further under the sixth custody factor), has friends who live close by, and is succeeding academically. There is no evidence that Father's military transfer from North Carolina to South Carolina adversely affected Child's best interests. There is no evidence that possible future military transfers may harm Child's best interests. (Indeed, Child appears to have adapted quite well to life in South Carolina). There is no credible evidence that Child suffers in any way under Father's primary physical custody. There is no credible evidence that Child wants or needs more time with Paternal Grandparents.

Rather, the evidence clearly demonstrates that Paternal Grandmother disrupts the stability and harmony in Child's life by discussing custody issues and disparaging Father, Mother, and Stepmother in front of Child – all of which upset Child. Paternal Grandparents' actions also harm the quality of life Child experiences in Father's household. By sending an extravagant number of Christmas gifts to Child, while ignoring their other grandchildren (her half-siblings), Paternal Grandparents sow the seeds of discord and resentment between the siblings. The 2020 display was so outrageous that even Child felt bad for her brothers. In short, Paternal Grandparents' actions are cruel.

Paternal Grandparents' behaviors harm not only Child and her half-siblings, but Father and Stepmother as well. No loving parent could avoid the heartache (or headache) of such a lopsided affair. Furthermore, Father and Stepmother are left with the obvious aftermath – resolving the

15

situation fairly and soothing hurt feelings. While Paternal Grandparents have no obligation to send *anyone* gifts, their overall pattern of conduct demonstrates that their actions are intentional and planned. Father has repeatedly cautioned Paternal Grandparents that bestowing lavish gifts on Child while ignoring her siblings is hurtful to his family – to no avail. Paternal Grandparents know their behavior is inappropriate and hurtful, yet they fail or refuse to adapt to Child's wishes or her best interests. This shows the willful purpose of their actions.

As outlined in the discussion of Factor No. 1, above, Paternal Grandfather previously testified that Paternal Grandparents hoped to retain primary physical custody of Child until her relationship with Father or Mother blossomed. By all accounts, Child's relationship with Father *has* blossomed. (Child also clearly enjoys her time with Mother and expressed substantial excitement about spending Christmas break with her.) Returning Child to Paternal Grandparents' primary physical custody at this juncture would disregard Paternal Grandfather's previously expressed intent. It would destroy the stability that has been established since Child entered into Father's primary physical care, and it would harm the relationship between Child and her parents. The record is replete with evidence regarding Paternal Grandmother's disparagement of Father, Stepmother, and Mother.

It is also clear that Paternal Grandparents will say anything, regardless of its truth, and take any action, no matter how outrageous, if they believe it will aid them in what can be fairly described as a harassment campaign against both Child and Father in their pursuit to regain primary physical custody. This factor favors Father.

5. *The availability of extended family.*

The parties presented minimal new evidence. *See generally* 2020 CUSTODY OPINION, at p. 29. However, Paternal Aunt now apparently resides in North Carolina. This factor remains of minimal significance and continues not to favor any party.

6. *The child's sibling relationships.*

Child has two half-brothers in Father's household and one half-sister who lives with Mother. Although the parties provided limited new evidence, it was modestly insightful. By all appearances, Child has developed typical sibling relationships with her younger half-brothers.

16

Additionally, Child was saddened for her brothers when Paternal Grandparents sent her a large number of Christmas gifts but ignored them. Also, Child expressed excitement about seeing her half-sister when she visits Mother around Christmas. This factor slightly favors Father. To a lesser extent (because testimony on the relationship was scant), this factor also supports Mother's position over Paternal Grandparents.

7. *The well-reasoned preference of the child, based on the child's maturity and judgment.*

Child testified with a degree of intelligence and maturity at or above her chronological age of ten. Child presented herself as a happy individual – happy living in Father's household and happily looking forward to spending time with Mother around Christmas. Child loves the house she lives in, and she has friends who live nearby. Child enjoys the current custody schedule and does not want to spend additional time with Paternal Grandparents. Child has made Paternal Grandmother aware – through both words and actions – that she enjoys living with Father and does not like Paternal Grandmother disparaging her parents or Stepmother. In summary testimony, Paternal Grandparents' counsel alleged that Child "wishes she had more time with them." N.T. (Nov. 23, 2021), at p. 21. This allegation is not supported by Child's testimony. Despite her testimony to the contrary, Paternal Grandmother knows that any statements such as this are extracted through Paternal Grandmother's repeated harassment and badgering of Child.

Child acknowledged that Paternal Grandmother made her cry during at least one incident. With the passage of time, Child has somewhat forgiven Paternal Grandmother but has not forgiven her completely. Child's time with Paternal Grandparents can be fun, akin to a vacation. *See, e.g.,* INTERVENORS' EX. 3. Still, Child becomes upset when Paternal Grandparents speak ill of Father or Mother. Unfortunately, Child does not know how to make Paternal Grandmother stop disparaging her parents because Paternal Grandmother has behaved this way for a significant period of time.

This factor generally favors maintaining the current schedule. However, this factor also supports an adjustment that would safeguard against Paternal Grandparents' continued disrespect of Father, Step-Mother, Mother, and Child.

17

**8.** ***The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.***

Paternal Grandmother repeatedly attempts to turn Child against Father and Mother. Paternal Grandparents both testified and otherwise affirmed summary testimony that they do not discuss custody issues with Child and that Paternal Grandfather has not intervened to stop Paternal Grandmother from discussing custody issues with Child. This testimony lacked credibility.

In contrast, Child testified credibly that she tells Paternal Grandmother to stop discussing custody issues and disparaging her parents. Paternal Grandmother refuses to refrain from these actions. Paternal Grandmother has upset Child to the point of tears. Paternal Grandfather intervened on at least one occasion to stop Paternal Grandmother from harassing Child. Paternal Grandmother tells Child that Father and Stepmother "lie" and that they are "the bad guys." Paternal Grandmother repeatedly asks Child if she wants to live with Paternal Grandparents; Child will eventually capitulate when Paternal Grandmother "bugs" her enough. Child credibly testified that Paternal Grandmother knows Child wants to live with Father and Stepmother and that she has made this clear to Paternal Grandmother.

Paternal Grandmother discussed custody issues with Child around the Thanksgiving 2020 holiday. Paternal Grandmother also showed Child texts between the adults regarding custody issues. Occasionally, Child does not want to talk to Paternal Grandparents, generally after Paternal Grandmother upsets Child by disparaging Father or Stepmother. Paternal Grandmother also disparages Mother.

Father encourages Child to talk to Paternal Grandparents. Mother does not speak ill of Paternal Grandparents in Child's presence.

This factor heavily favors Father and Mother. In light of the numerous, flagrant, willful, outrageous, and ongoing actions taken by Paternal Grandmother, this factor must be afforded substantial weight.

**9.** ***Which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs.***

18

Father and Mother are more likely to maintain a loving, stable, consistent, and nurturing relationship with Child. Paternal Grandmother disrespects Child's wishes by continuing to discuss custody issues with her. Paternal Grandmother continues to disparage Child's parents and Stepmother despite Child's protests. While this Court finds that Paternal Grandmother loves Child in her own way, it is clear Paternal Grandmother does not love Child enough to respect Child's well-reasoned preferences and desires. Paternal Grandparents have willfully put Child in an embarrassing situation that could disturb the harmony in Father's household (*i.e.,* the Christmas gift incidents). Paternal Grandmother has allowed the deep scorn she harbors for Father to poison the love she has for Child. This is tragic and heartbreaking. Ultimately, only Paternal Grandparents can rectify this issue. They must endeavor to make good faith strides in repairing the damage they have caused and accept responsibility for their actions, lest they poison the relationship(s) permanently.

This factor weighs in favor of Father and Mother.

**10.** ***Which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the child.***

Father and Mother are both more likely to attend to the daily emotional, developmental, and special needs of Child. Father and Mother have shared legal custody and the majority of physical custodial time. Child is flourishing socially, emotionally, and academically. Mother keeps apprised of Child's academic standing and other needs. By all accounts, Child is thriving under the guidance of Father and Mother.

Paternal Grandmother's conduct demonstrates a substantial lack of emotional maturity. Paternal Grandfather has, in all but one established instance, largely remained a passive bystander to Paternal Grandmother's disturbing conduct and general harassment of Child. The development of emotional maturity is essential for all people; and children who develop emotional maturity will be more prepared to deal with difficult life events, both as teenagers and adults. Paternal Grandmother cannot foster the development of a skill she so greatly lacks. Children must also learn the importance of civility and respect. Child cannot learn this from Paternal Grandmother either. Paternal Grandfather has not demonstrated a consistent willingness to defend Child or to promote these skills. To the extent Child may need special assistance navigating a healthy

19

relationship with Paternal Grandparents, Paternal Grandparents are clearly unable to aid Child in this regard.

No party is particularly more likely to attend to Child's daily physical needs.

This factor weighs in favor of Father and Mother.

**11.** ***The proximity of the residences of the parties.***

Father lives in South Carolina; Mother resides in Indiana; and Paternal Grandparents live in Pennsylvania. Paternal Grandparents suggest that Father's military transfer from North Carolina to South Carolina makes it increasingly difficult for them to exercise their limited custodial time. N.T. (Nov. 23, 2021), at p. 22. This is essentially an attempt to relitigate established matters. This Court has already determined, and the decision was not appealed, that Father's military transfer was not a relocation (and did not significantly impair Paternal Grandparents' custody rights). *See generally* OPINION AND ORDER DATED AUG. 30, 2021, FILED AUG. 31, 2021. This factor does not favor any party.

**12.** ***Each party's availability to care for the child or ability to make appropriate child-care arrangements.***

The parties presented no meaningful or credible new evidence on this issue. This factor does not favor any party.

**13.** ***The level of conflict between the parties and the willingness and availability of the parties to cooperate with one another. A party's effort to protect the children from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.***

As noted under Factor No. 1, Father and Mother demonstrated an ability to cooperate and to make reasonable accommodations regarding the custody schedule. They have developed a strong co-parenting relationship and mutually discuss issues pertaining to Child. Mother and Stepmother are also very cooperative, and Child describes them as best friends. There is a low level of conflict and a high level of cooperation, civility, and respect between Father and Mother.

Conversely, there is substantial conflict between Paternal Grandparents and Father, and – to a lesser, but not insignificant – extent, between Paternal Grandparents and Mother. This conflict

20

is nearly exclusively created by Paternal Grandparents, especially Paternal Grandmother. Paternal Grandparents do not respect Father and have openly disparaged him in front of Child.

In summary testimony, Paternal Grandparents' attorney stated that Father "raises the level of conflict *by continuing to try to take away my clients' custody time.*" N.T. (Nov. 23, 2021), at p. 22 (emphasis added). First, this Court previously determined that it was in *Child's* best interests for Father to have primary physical custody. *See generally* 2020 CUSTODY OPINION. The Superior Court affirmed that decision. At its core, Paternal Grandparents' position is that Father initially raised the conflict between them because he litigated for custody. This reflects poorly on Paternal Grandparents' emotional maturity and suggests that their true interests in this custody modification are self-serving. To the extent Father currently seeks to limit Paternal Grandparents to supervised physical custody, Father seeks this relief not out of malice, but – again – out of the Child's best interests to protect her from Paternal Grandmother's outrageous behavior. To the extent Paternal Grandparents bemoan that Father consented to only four hours of custody time for Thanksgiving 2021, whereas they received five hours the year prior, and whereas the custody order affords them up to eight hours around the holidays *if consented to by all parties*, Paternal Grandparents should consider themselves fortunate to receive *any* time in light of Paternal Grandmother's egregious behavior. There is no credible evidence that Father does not cooperate with Paternal Grandparents or honor his commitments.

As discussed throughout this Opinion, Paternal Grandmother's actions have been outrageous and harmful to Child. It is particularly *Paternal Grandmother* who has raised the level of conflict between the parties. As noted under Factor No. 10, Paternal Grandmother's refusal to take responsibility for her actions also reflects poorly on her emotional maturity and general fitness to care for Child.

Father believes that Paternal Grandmother simply wants to "win" and is primarily driven by a desire to exert control over both Child and Father, rather than being guided by a genuine pursuit of Child's best interests. N.T. (Nov. 23, 2021), at p. 8. Father's conclusion is supported by the evidence. Paternal Grandmother demonstrated by her conduct that she is, indeed, primarily driven by her own interests and desires, not the best interests of Child.

21

It is abundantly clear that Paternal Grandparents will say and do anything – no matter how false, baseless, or disingenuous – in their attempts to garner additional custody time with Child. By way of example, this Court incorporates its discussion above regarding the October 18, 2021, Petition and the October 20, 2021, Petition. Paternal Grandparents' baseless accusations and frivolous litigation increase the level of conflict.

This factor favors Father.

**14.** ***The history of drug or alcohol abuse of a party or member of the party's household.***

None of the parties have a history of drug or alcohol abuse. This factor is not relevant to the custody determination.

**15.** ***The mental and physical condition of a party or member of a party's household.***

In summary testimony, Father's counsel suggested that Paternal Grandmother may have mental health issues based on her outrageous behavior, and that she should undergo a mental health evaluation. Father, through his counsel, acknowledged that he could not make such a diagnosis himself. Paternal Grandmother found this idea to be laughable and, perhaps mockingly, agreed to undergo a mental health evaluation. This Court has discussed at length the negative impact Paternal Grandmother's outrageous actions have had on Child. There is no factual basis (*i.e.*, professional diagnosis) at this time for those actions to be characterized as resulting from a mental health issue.

There is presently no new evidence that any party (or anyone in a party's household) has any new mental or physical conditions. This factor does not favor any party.

**16.** ***Any other relevant factor.***

Some of the testimony presented in this hearing touched upon matters that were previously addressed in proceedings on the Cross-Contempt Petitions. As noted in the Procedural History above, this Court determined that Paternal Grandparents were not in contempt of the custody order despite engaging in "shocking" behavior. After receiving credible testimony from Child in this proceeding (who did not testify in the Cross-Contempt proceedings), this Court is satisfied that some of these issues have now been established by a preponderance of the evidence. Paternal Grandparent's observation that they were not found in contempt previously has little, if any,

22

bearing on *this* proceeding. *See generally* N.T. (NOV. 23, 2021), at p. 27. The November 23, 2021, hearing was the parties' opportunity to present their respective cases on the modification issue. At any rate, non-contemptuous conduct can still negatively impact a child's best interests.

Of further note, between Father and Mother, there is no presumption that primary physical custody should be awarded to either party. 23 PA. CONS. STAT. ANN. § 5327(a). However, both Father and Mother receive a presumption over Paternal Grandparents in this regard:

> **(b) Between a parent and third party.**--In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence.

23 PA. CONS. STAT. ANN. § 5327(b). Not only have Paternal Grandparents failed to rebut the presumption in favor of Father (and Mother), but moreover, Paternal Grandparents' position has either weakened or (at best) remained unchanged for every child custody factor under the present analysis compared to the 2020 Custody Opinion. This is not a case where Paternal Grandparents merely sought additional partial physical custody, but a case where they requested *primary physical custody* and shared legal custody. *See generally* PETITION FOR MODIFICATION; AMENDED PETITION FOR MODIFICATION. Paternal Grandparents failed to produce **_any_** (new) meaningful and credible evidence that would favorably impact any of the custody factors. Functionally, the latest chapter in this saga of litigation has been nothing more than an attempt by Paternal Grandparents to relitigate prior chapters.

## CONCLUSION

It is abundantly clear that Child's best interests require Paternal Grandparents to have only supervised physical custody until they can demonstrate an ability to interact with Father, Mother, and Child in a respectful and appropriate manner. Paternal Grandmother's general harassment and badgering of Child, as well as her blatant disregard for Child's well-reasoned preferences, cannot continue unabated.

ACCORDINGLY, THIS COURT ENTERS THE FOLLOWING ORDER:

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CIVIL DIVISION

TRENTEN J. BOBACK,            :      No. 2014 – 177

          Plaintiff,        :

           v.           :

CHRISTINA M. WENDELL, now   :
CHRISTINA M. PERSHING,      :

          Defendant,     :

           v.           :

MICHELE L. BOBACK and     :
JEFFREY R. BOBACK,       :

          Intervenors.    :

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:

    For Plaintiff:             RANDI J. SILVERMAN, ESQUIRE

    For Defendant:           SELF-REPRESENTED

    For Intervenors:         LAUREN DARBOUZE, ESQUIRE
                           ANDREW SHESKO, ESQUIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER

AND NOW, this 9th day of February, 2022, it is hereby ORDERED AND DECREED as follows:

1.  Plaintiff's Petition for Contempt and Special Relief, filed December 9, 2020, as consolidated and integrated into the custody modification proceedings is GRANTED IN PART as to special relief.

2.  Intervenors' Petition for Special Relief, filed October 18, 2021, is WITHDRAWN.

3.  Intervenors' Amended Petition for Special Relief, filed October 20, 2021, is DISMISSED AS MOOT.

4. Intervenors shall pay counsel fees of $864.75 to Plaintiff's counsel, Randi J. Silverman, within 60 days.

a. This award of counsel fees is entered without prejudice. Plaintiff shall have 10 days to submit a supplemental invoice (with service upon all parties) for counsel fees incurred for hearing on November 23, 2021.

b. If Plaintiff submits a supplemental invoice as contemplated in Paragraph 4(a), Intervenors shall raise any objections to the supplemental invoice within 10 days of receipt.

BY THE COURT:

_Linda Rovder Fleming_
Linda Rovder Fleming, Judge

2

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CIVIL DIVISION

TRENTEN J. BOBACK,             :          No. 2014 – 177

         Plaintiff,       :

       v.             :

CHRISTINA M. WENDELL, now    :
CHRISTINA M. PERSHING,

         Defendant,    :

       v.             :

MICHELE L. BOBACK and      :
JEFFREY R. BOBACK,

         Intervenors.   :

*************

APPEARANCES:

     For Plaintiff:               RANDI J. SILVERMAN, ESQUIRE

     For Defendant:            SELF-REPRESENTED

     For Intervenors:         LAUREN DARBOUZE, ESQUIRE
                                ANDREW SHESKO, ESQUIRE

*************

**ORDER**

AND NOW, this 9th day of February, 2022, it is hereby ORDERED AND DECREED that the following custody schedule is in the best interest of the child:

1.     **LEGAL CUSTODY**. Plaintiff, Trenten Boback ["Father"], and Defendant, Christina M. Wendell, now Pershing ["Mother"], shall have shared legal custody of the minor child, namely, J.M.B. (a ten-year-old female born in November 2011).

a.  Legal decisions:  All decisions affecting the child's growth and development including, but not limited to, medical and dental treatment; education; religion; summer camp; ages for dating and driving; athletic pursuits; extracurricular activities; and choice of daycare provider/babysitters shall be considered major decisions and shall be made by the parents jointly, after discussion and consultation with each other and with a view towards obtaining and following a harmonious policy in the child's best interests.

b.  **Coronavirus:  Coronavirus-related issues shall be decided by the parents jointly.  This includes, but is not limited to, issues regarding whether the child should be vaccinated, travel to high COVID-19 areas, self-quarantine, be tested, receive medical treatment, wear a mask, attend social gatherings, have contact with persons who may have been exposed to the virus, etc. Shared legal custody also includes all decisions related to the child's education, including choice of the educational delivery system (in-person, virtual, or hybrid) and other learning options.**

c.  Access to records.  The parents shall have equal access to all pertinent records pertaining to the minor child, such as, but not limited to, medical, dental, religious and/or school records.  Each parent shall be entitled to complete and full information from any physician, dentist, clergy, teacher or authority and have copies of any reports given to them as a parent.  Such documents include, but are not limited to, medical reports, dental reports, religious reports/records, academic and school report cards, birth certificates, etc.  Both parents may and are encouraged to attend school conferences and activities.  The names of both parents shall be listed with the school as the individuals to be contacted in the event of an emergency and to be notified regarding school events.

d.  Exchange of information.  Each parent agrees to keep the other informed of the progress of the child's educational and social adjustments.  Each parent shall notify the other parent in advance of any planned teacher conferences, which

2

both parents have the right to attend. Each parent shall notify the other parent in advance of any school open houses, performances, athletic events, or other significant extracurricular events involving the child. Each parent agrees not to impair the other party's right to shared legal custody of the child.

e. Notification: Each parent shall have the duty to notify the other parent of any event or activity that could reasonably be expected to be of significant concern to the other parent.

f. Illness: In the event of any serious illness of the minor child at any time, any party then having custody of said child shall immediately communicate with the other parties by telephone or any other means, informing the other party of the nature of the illness. During such illness, each party shall have the right to visit the child as often as he or she desires, consistent with the proper medical care of the child. The word "illness" as used herein shall mean any disability which confines the child to be under the direction of a licensed physician for a period of in excess of forty-eight (48) hours.

g. Scheduling of activities. Neither parent shall schedule activities or appointments for the child that would require the child's attendance or participation at said activity or appointment during a time when the child is scheduled to be in the custody of the other parent without the other parent's express prior approval.

h. Communication. The parents shall communicate directly with one another concerning any parenting issue requiring consultation and agreement and regarding any proposed modifications to the custody schedule, which may from time to time become necessary. Neither parent shall discuss with the child any proposed changes to the custody schedule prior to discussing the matter and reaching an agreement with the other parent.

3

2. **PRIMARY PHYSICAL CUSTODY.** Father shall have primary physical custody of the minor child.

3. **SUMMER SCHEDULE.** The parties may work together to determine a mutually acceptable summer schedule. In the absence of a written agreement to the contrary, the following summer schedule shall apply:

   a. Commencing on the Sunday following the conclusion of the school year, Mother shall have custody of the child until Fourth of July week, when Intervenor, Jeffrey R. Boback ["Paternal Grandfather"], is off from work.

   b. Paternal Grandfather and Intervenor, Michele L. Boback ["Paternal Grandmother"; collectively, "Paternal Grandparents"], shall have, at the reasonable discretion of Father and Mother, supervised partial physical custody for up to ten (10) hours per day for as many as seven consecutive days, beginning on the first day of Fourth of July week. The parties shall work together to mutually determine whether the periods of supervised physical custody, if any, shall occur in Indiana, Pennsylvania, South Carolina, or another reasonable location. Paternal Grandparents' physical custody shall be supervised by Father, Mother, or any competent adult(s) mutually designated by Father and Mother.

   c. Father and Mother shall share physical custody from the first day of Paternal Grandparents' potential summer supervised physical custody until two weeks prior to the commencement of the following school year, as mutually agreed.

   d. Father and Mother shall accommodate the other parent's efforts to schedule family vacations during the summer.

4. **TRANSPORTATION.** Father and Mother shall work together to determine mutually acceptable transportation arrangements. In the absence of a written agreement to the contrary, Father and Mother shall meet at an agreed location when they exchange custody.

4

5. **HOLIDAYS.**

   a. Father and Mother shall share or alternate holidays by mutual agreement, taking into consideration the length of time the child is off from school.

   b. Paternal Grandparents shall have, at the reasonable discretion of Father and Mother, supervised partial physical custody of the child for up to eight (8) hours near major holidays, at times and locations to be mutually agreed upon between Father, Mother, and Paternal Grandparents.

   c. Paternal Grandparents shall have, at the reasonable discretion of Father and Mother, up to four (4) hours of supervised partial physical custody at any time Father or Mother is visiting Cambria County.

6. **DEPLOYMENT.** In the event Father is deployed or is required to be in the field during the school year, the child shall remain in the care of Father's wife, Justine Boback. The parties will follow the summer schedule if Father is deployed or in the field during the summer.

7. **FAMILY FUNERALS, WEDDINGS, AND REUNIONS.** Father and Mother shall have custody of the minor child for attendance at family funerals, weddings, and reunions, provided that reasonable notice is given to the other parties and provided that the parties arrange for appropriate make-up or compensatory time. Paternal Grandparents shall have supervised partial physical custody at these events only if reasonable accommodations for supervision can be arranged.

8. **CANCELLATION.** Each party shall provide the other with at least twenty-four (24) hours advance notice, if possible, of their intention to cancel a period of custody.

9. **NON-DEROGATION CLAUSE.** While in the presence of the minor child, no party shall make any remarks or do anything whatsoever which can in any way be construed as derogatory or uncomplimentary to the others, and it shall be the duty of all parties to uphold the others as ones whom the child should love and respect. While in the

5

presence of the minor child, the parties shall prevent third parties from making any remarks or doing anything whatsoever which can in any way be construed as derogatory or uncomplimentary to the others.

10. **SMOKING, DRUG AND ALCOHOL USE**. While in the presence of the minor child, no party shall be under the influence of any alcoholic beverages. No party shall own, use, possess, or transport illicit drugs or prescription medication not used in accordance with the party's own physician's directives while having custody of the child. No party shall smoke or allow others to smoke around the child.

11. **DRUGS AND ALCOHOL DURING TRANSPORTATION**. No party shall, while transporting the minor child, operate a motor vehicle while under the influence of alcohol, medication not administered according to the party's own physician's directives, or illegal drugs.

12. **MAIL ACCESS**. Father and Mother shall have reasonable mail access, including e-mail, to the minor child while in the custody of the other parties. All communications between Paternal Grandparents and the minor child shall be supervised.

13. **TELEVISION, MOVIE, MAGAZINE CONTENT**. While in their respective care and supervision, no party shall permit the minor child to be subjected to inappropriate, excessively violent and/or explicitly sexual material, whether from television programs, movies, or magazines.

14. **PROMPTNESS AND DELAYS**. It shall be the obligation of each party to make the child available to the others in accordance with the custody/visitation schedule and to encourage the child to participate in the plan hereby ordered. The parties shall be prompt in picking up the minor child at the scheduled times. The parties shall be prompt in having the minor child ready for pick up at the scheduled times. Each party shall promptly notify the other party of any travel delays which might affect the custodial arrangements.

15. **TELEPHONE CONTACT**. The noncustodial party shall be permitted to telephone the child each day at a reasonable hour. The custodial party shall ensure that the noncustodial party is afforded adequate time to speak with the child. The calls may be monitored. The parties shall provide one another with the current telephone number of the child (if any) and of each other. If the child is not present at the time the telephone call is placed, a message shall be left and the custodial party shall have the child return the call as soon as possible. The parties shall use their best discretion as to the time, frequency, and duration of the calls.

16. **TRANSPORTATION REQUIREMENTS**. During all times they are transporting the minor child, the parties shall use appropriate seat belts, child car seats, etc., to make sure the minor child is being transported in a safe and legal manner.

17. **EXECUTION**. All parties, including adult members of the respective households, shall use their best efforts to ensure that they, their extended families and household members cooperate in carrying out the intent and spirit of this Order.

18. **RELOCATION BY ORDER OF COURT**. A party proposing to change the residence of a child which significantly impairs the ability of a non-relocating party to exercise custodial rights shall follow the procedures required by 23 Pa. C.S.A. §5337 and Rule of Civil Procedure 1915.17.

19. **JURISDICTION**. This Order shall remain in full force and effect until further Order of this Court. The Court of Common Pleas of Cambria County, Pennsylvania, shall retain jurisdiction over the subject matter of this case unless and until said Court shall relinquish said jurisdiction.

BY THE COURT:

_____
Linda Rovder Fleming, J.

7